T-1621, Minnesota, Midwest Medical Solutions, et al. v. Exactech U.S. And Judge Colleton, you can find Tiffany Blofield under the GT Conference moniker. Yes. I see her across the way. We're in the conference room. You can see Ms. Blofield, but I don't know if you have a way to zoom in at all. It might be better once we get to your argument. Yes, I will do so. All right. Very well. You may mute yourself for now because we'll hear first from Mr. Nystrom and we'll just wait for counsel. I think counsel's ready. So, Mr. Nystrom, you may proceed. Thank you, Your Honor. May it please the court. This particular case here involves a sales agreement, agency agreement, between Exactech and Midwest Medical and Hugh Bradley. It involves specifically an unambiguous contract provision that sets out a formula for what is termed restricted period compensation or severance that follows the termination of the agreement. And the language here is something that I want to really focus on very heavily because the district court, and I think Exactech as well, recognizes that it is unambiguous. And the provision says that in the event that this agreement is terminated or not renewed by Exactech, then during each calendar month of the first six months after such termination, Exactech will pay agency an amount equal to 7.5% of the total sales in the territory during the trailing 12 months ending on such termination date. Because the provision here is unambiguous, the analysis in this case begins and ends with this language. There's no need to go beyond the language to try to figure out what it means. And in fact, because it's plain and unambiguous, it is deemed to be an expression of the intent of the parties. As a result of that, there isn't any need to go beyond interpretive principles such as looking into the contract as a whole, standing on the position of the parties at the time of the contract was made because these tools are only employed when there's an ambiguity in the contract and the court is attempting to determine the party's intent such that there is conclusive evidence and it can be resolved as a matter of law. What's very important and I guess your client then under this view would receive a 45% total over the six month period. 7.5 times six, is that how it would come out? No, no, it would be if you look at the formula, your honor, the 7.5% formula specifies that it's 7.5% of the trailing 12 months of sales. And that amount is paid each month for six months. Right, so I was just doing the math and saying if you got 7.5% each of six months, 7.5 times six I think would be 45. So I was thinking you get 45% of the revenue from the trailing 12 months. As I do the math in my head, yes, you're right, your honor. And I think the district court was concerned that that was unreasonable to believe that the parties would have agreed to that. Is that relevant under Minnesota laws or any kind of exception to plain language for unreasonable or absurd results? There is not. As a matter of fact, as I said before, the analysis here begins and ends with the contract language. When the district court made judgments about reasonableness and rational relationships and absurdness and windfalls, which came out of the exact text brief, what it was really doing was passing judgment on the merits of the deal that was struck by the parties. What's very apparent, both in the briefing from the appellee and the district court, is that neither one of them have ever analyzed the language of 5D2 as it is written or tried to apply it. In fact, while the district court quoted it in its opinion, it literally just jumped to the next step of analysis of contract interpretation in terms of putting itself in the position of the parties at the time of contracting, looking to the purpose of the RCP provision, making the reasonableness determination and the harsh and absurd result. By engaging in this analysis, what the district court did was ignore the principles of determining the party's intent from the language alone. As I mentioned just a moment ago, the failure to actually apply the language is very telling here. When you look at the cases that find language to be plain and unambiguous, the courts in those cases really do a fulsome analysis of the language of the provision and apply it to the facts of the case. Mr. Nystrom, what if the provision didn't say 7.5%, but it said 75% or 95%? And under your theory, the provision is clear and unambiguous, but the number is so high, maybe it's 99% or 100%. Is there, I guess, a follow-up on Judge Colleton's question with a little bit more focus? Is there any room in Minnesota law that allows a district court to correct that? Or do you just accept the mistake when at least in this, as the case is coming to us, there's no assertion of mutual mistake or typographical error. So what if it said 99%? If it said 99% and it was as written, and in the absence of, if the plain and unambiguous language as written said 99%, the courts would be bound to apply that under Minnesota law. When you look at the... Could this mistake doctrine come into play at some point? How would that come in? I think that the mistake doctrine would come into play. What you would really be seeking in that set of circumstances, Your Honor, is reformation of the contract. There would be a claim, I expect, that the language that was used didn't accurately reflect the actual intent of the parties. That requires either a mutual mistake or a unilateral mistake that's accompanied by inequitable conduct or fraud. None of those are here. There's no evidence of that. Interestingly, in the original counterclaim that was asserted by Exact Tech, those claims were present there. Mutual mistake, excuse me, rescission and reformation. But they were never pursued and there's never been any evidence of that. And I think that it also, when you look at it in that sense, it brings to fore the negotiation of this provision. This was not a provision that Mr. Bradley, on behalf of Exact Tech, excuse me, on behalf of Midwest and his regional vice president, sat down and agreed to over drinks after work and then written down in a cocktail napkin. This was a provision that was negotiated specifically by lawyers on either side of the case and agreed to by the parties. So the suggestion that there is some sort of a mutual mistake or unilateral mistake just doesn't find any support in the record here. Does the record show who the lawyers were? The record does show who the, yes, the record does show who the lawyers were. In Mr. Bradley's case, right after this dispute arose, he passed away very suddenly, so he is no longer with us. And the Exact Tech lawyer, I think, is identified in the record as well. Counsel, I want to go back to a statement you just made where you say that in the, I guess, an Exact Tech pleading, maybe an answer or counterclaim, it's got some allegations that there were, like a previous draft of this agreement, accurately set forth the terms and then in the later draft, it's, I guess, that contention is that some words were omitted. There was a phrase omitted from this provision which resulted in this rather large compensation amount. Do you think the district court took that assertion into account here? Like, you know, some claim of Scrivener's error or mistake? Your Honor, there's no indication that the district court did do that. I've seen the provision that you're referencing in the pleading and quite candidly, we have an unambiguous provision here and that provision reflecting early negotiations of this deal just simply doesn't come into evidence under any circumstance. Well, what was before the district court? Were there depositions, affidavits? There were affidavits that were submitted by the parties. There had been no depositions. Summary judgment was filed very early in this case, within about six weeks. Frankly, because there was no ambiguity in the provision. So you're saying the only thing before the court was the contract itself? The contract itself, yes, and there were some other documents that related to the reason for the termination of the contract, which was another ground for summary judgment. That's not before the court right now. Now, Mr. Nystrom, you mentioned claims or counterclaims of reformation and rescission, and I think you said something to the effect that they were not pursued. But are they still in the case? If the case were reversed, if the judgment were reversed, would those claims still be alive on remand? No, Your Honor, they would not. And the reason is that after Judge Erickson's decision came down, Exact Tech amended its answer and counterclaims and dropped those. I see. Which, given the decision, that's not altogether surprising, but that's the sound. Well, except that if their fallback position was, if the language is clear, as you say, that it was a mutual mistake or some other reason there should be rescission or reformation, I would have thought they would want to keep that in the case. But you're saying they voluntarily dismissed those claims? They amended their answer and counterclaims, and in the amendment, those claims were not present. So there was no dismissal. They were simply amended out of the action. After the judge ruled? Yes. What was the point of the amendment after the judge ruled to allow for a final judgment? No, you'll have to ask Exact Tech's lawyers. I don't know the answer to that, Your Honor. I'm into my rebuttal time, but I do want to make two very quick points here, and it does dovetail into what we're talking about. There's no way to read this language without the district court's decision. What it really did was it read out of the agreement the phrase, then during each calendar month of the first six months after termination. The district court's decision did that. There simply isn't any way to read this language as putting a hard cap of 7.5% of trailing 12-month sales. And as to whether somebody would make that kind of an agreement or not, one of the things I think that you have to look at is the scope of the non-compete here. It not only applied to Midwest Medical, it also applied to all the sales representatives that it employed. When you look at the impact of that provision, it's not surprising that Mr. Bradley would have negotiated for something on the generous side of his restricted period compensation. Finally, Your Honor, if you look at all of this, again, and I look at the Quinstar decision and the Brookfield decision, which are two of the prominent cases here, in both of those cases, the courts, after determining the language was plain and unambiguous, went through what I would consider a fulsome analysis of that language and applied it. That's never happened here, and I think there's a very good reason for that, which is to say the language simply does not support either the district court's ultimate decision or exact exposition. I'd like to reserve the rest of my time. Thank you. You may. Thank you for your argument. Ms. Blofield, we'll hear from you. Your Honor, Tiffany Blofield from Greenberg Traurig on behalf of Appellee Exacting. May it please the court. I'm going to jump right in here and say I disagree. The harsh and absurd exception that Your Honor broached is there, and that's what the American Commerce versus Insurance Brokers case and the City of Virginia versus Northland Office said. You have to look if it's a reasonable interpretation. Mr. Nystrom's here on behalf of his client trying to do an unreasonable interpretation, and Quinnstar does apply. They seem to claim that Quinnstar only applies to ambiguous contracts. That's not true. If you look at page 754 of the Quinnstar case, you initially have to look at whether it's ambiguous or not, and in that, the court instructs to look at the purpose of the agreement, to look at the entire agreement, to harmonize all of the provisions, to also look at the plain language, and also look at the surrounding circumstances. You can't just take this one sentence and focus your interpretation on that. You have to look at all of these. So, counsel, in your view, under Minnesota law, to determine whether a particular provision is ambiguous, you step back and look at the entire contract? Correct. Your Honor, and Quinnstar tells you that on page 754. All of the other case law that we've cited, I think both parties talk about, you have to look at the entire contract. Let me follow up on that a little bit. It seems to me almost there's a difference between being ambiguous or unambiguous, and being unambiguous and just sort of resulting in an absurd consequence. That distinction seems to have some substance. Yes, and I think that's where, in Quinnstar, it talks about you have to look at, in determining whether it's ambiguous, is it a reasonably susceptible meaning for the contract? And here, I was trying to think if I could find an example where it was unreasonable and not absurd and harsh. I think that there probably are some out there, but the case law we've focused on is it's unreasonable because the reasoning that someone in the position of Midwest is trying to argue that it should be is unreasonable. It's going to be absurd or harsh result. But that Quinnstar language is talking about a reasonable understanding of the language, not of the result. What's the reasonable reading of this language other than that you must pay 7.5% during each of the six months? The reasonable, I think we've set forth, the six months is the terms for the payment of the 7.5% of the annual sales or the 12 trailing months. So it's telling you as to the amount of payment. And second of all, you have to look at the other provision, which is the commission that the Midwest would receive. And in this case, I think it was $800,000. The court plugged in some numbers. You could put in different numbers. We put in a hypothetical with different numbers. But you have to look at the proportionality. And that's in looking at the actual agreement in the terms. In the Podpesker case that we cited, the court said, well, not perfectly drafted. You have to look at the reasoning for that one provision. You have to look at the whole of the contract. And they said, of course, the limitation on the warranty applied to both the battery warranty and the equipment warranty. Here, you can't look at the fact, in fact, I think the court put this out, is that you'd have to, the district court rule said, you'd have to say it would be an incentive for Midwest to breach this agreement because they'd make more under this restricted period commission or compensation than they would if they actually did the work. How in the world, it would be absurd to say you want to encourage somebody to breach the contract. And, in fact, that's what the Robeson case that we cited said. In there, the Minnesota Court of Appeals said you couldn't interpret the contract to have a consequence where they failed to meet their deadline. They'd actually make more money for it. And they said this is an absurd reading. And you couldn't impute the principle getting some interest during the deferral period. It would incentivize people to breach contracts. That would be the same view. But isn't there, there is a mechanism in the state law to address this kind of a problem, and that's through a counterclaim for a reformation or some kind of mutual mistake. So it's not as if a party in Xactech's position doesn't have an ability to present this sort of, oh, this couldn't have been what this really meant, and there's been a mistake. So it's not as if if you don't get it here, there would be no opportunity for Xactech to prevail. And that's why we put that in the original complaint, or I should say answer and counterclaim, or answer, I think it was, and then we amended and added a counterclaim. But here we'd already won with the district court on the reasoning, so there was no need to pursue that avenue because we'd already won. And we believe that the district court got it right. In Quinnstar, you have to look at those three factors in order to determine if it's reasonable or not. And Midwest's interpretation is just not reasonable here. And the harsh and absurd results, there was no reformation in the American Commerce Insurance Brokers case, or the City of Virginia versus Northland Office. Both are cases that were relied on by the district court, the district court's opinion that should be affirmed. And you have to look at the entire agreement. There's no case law out there that says, just look at one sentence. You have to look at the whole entire contract, the circumstances of the contract. We've cited numerous cases. I know the court relied on American Commerce Insurance Brokers in the City of Virginia versus Northland Office. But we cited the Robeson case, the Iowa case, employers, Anderson, Podpester. None of those cases were reformation. The court just looked at, if there's only one reasonable interpretation, then it's unambiguous. And that's what the court found here. And it was a correct result. As was pointed out right at the very beginning of the case, you know, it would be 75, was it 45% would be, and that just doesn't make sense. It's just not part of it. Is it crystal clear? No, but it's one of those things where it doesn't have to be perfectly written. It can be, you have to look at whether there's two reasonable interpretations. Here there's not. Why don't you take us through the reasonable reading of these words. I understand what you say that you think it should mean, but how do you get that out of the words? It says, during each month, Exec Tech will pay 7.5%. How does that translate into Exec Tech will not pay 7.5% during each month? Let me grab this. During, again, the clause about the each six months is as to when the payments are made. It says during each month, six months. And then it says the payment though is equal to 7.5% of the total sales. And so the total sales in 7.5%, then the payments are made each of the six months. And that's the only reasonable interpretation that you can have. Otherwise it should have said 45%. So the only reasonable way to interpret this is as the district court did. And that's the same thing that they did in other contacts where they looked at it and they said there was only one reasonably susceptible meet. And so that is where that is. What about this amendment that happened according to Mr. Nystrom at the end? Can you explain that? Your counterclaims apparently are no longer in the case. We did not pursue them underneath because we had one. But I believe that they're still in the case. I will have to grab that. But why we amended the complaint was really to do a breach of confidentiality claim. And in that, we did not pursue that either. We ended up just coming to you with this because we had gotten the interpretation that was the correct interpretation by the district court. And we did put, I believe that the district court's opinion is found. You look at Quinn Starr, you have to look at the three factors, not just the exercise that we just did on a grammar exercise and one isolated provision. You have to look at that provision in connection and harmonize all the provisions, which we did in the response brief. And you have to look at it as compared to what the actual commissions that they were receiving as a salary or commission or payment versus what they get in this restricted payment time. It can't be more than what they would get for their salary. It just doesn't make sense. So you have to look at the agreement and the surrounding circumstances, and that is not the same thing as parole evidence. Parole evidence would be after you find that it's ambiguous. Here, there's only one reasonable interpretation, and that's what the district court found. We didn't have to go to parole evidence. We just looked at the agreement as a whole. And I think if you look at each of these agreements, they say you have to look at the whole agreement. There's none that say you just look at one particular sentence. And so you have to harmonize. What if the provision had said just 1%? Which would be way lower than maybe what would be a reasonable compensation for being cut loose from this contract. Then is it a reasonable interpretation to say it's 1% in each of the individual months for the following six months? No, it still wouldn't be because you could put in different numbers. I put in some different numbers. I'm sorry to interrupt, but not numbers in terms of salary. I'm talking about just the number that's in the contract, the agreement itself. If it said 1%, and he said, well, it's got to be 1% in each one of the following six months, would you come back and say, no, no, the reasonable result is 1% total? In other words, are you solid that the reading of this has to be a total amount that's divided up into six? I do believe that, Your Honor. Let me give you two answers. One is you still have to look at what the salary they would have gotten. So then the salary would have been different, too. You'd have to look at whether the salary and the percentage made it unreasonable. So that's one thing. So you'd look within the agreement. So if it was way low, if the 1% made it way low, so it wasn't a reasonable compensation for having been terminated from the contract, then it would be reasonable for the district court to say, no, that's 1% of the total in each one of the months, not divided up into six. Would that be reasonable for the district court to do? For the district court, if it had said 1%, well, then you'd have to look at what the salary was under that. I'd have to do those math calculations. But, again, it would have said, then, 6%. What the judge is looking at is the whole entire compensation and what you're supposed to be doing during that restricted period compensation. And so I don't believe it matters what the numbers are. I think that the district court did the correct thing. Second of all, though, that's my first argument. But my second argument is here. I'm going to go back to the judge's original point, that there is an exception for absurd and harsh result. You have to look at the entire contract. That is crystal clear in Minnesota law. You have to always look at the entire contract and harmonize all the provisions. And that's exactly what the district court did here. Well, counsel, what was before the district court other than pleadings? The contract itself. And the contract itself had the calculation of how the agent would be compensated. So they had a formula with 20% for this product and 20% for this product. And that's why the judge could illustrate in the footnote as to how this would come out. So that was very important. There was no deposition, for example, or affidavit where somebody says, wait a minute. That's not, this calculation is absurd. That's not what we intended. Correct, Your Honor. Because that would be parole evidence outside the agreement. The judge was able to look at the agreement itself and, again, not come to an unreasonable interpretation. Just like they did in the district, the city of Virginia versus Northland Office Properties and American Commerce Insurance Brokers. In those cases, there was no outside deposition testimony, no outside documents. It was all just looking at the agreement, which is exactly what the judge did here. And the same with the Robson case. I just want to highlight that because in that case, there was a failure to meet the deadlines. And so the Robson would have been incentivized not to meet the deadlines because he would get more money on this interest payment during the time period. And the court said that there was no testimony in that case either. It was just they looked at the four corners of the agreement, the surrounding circumstances. And let me just point out in the Virginia-Northland Office case, that was one where there was a resolution and they said that the bonds were no longer outstanding. And so they reissued the bonds in 1983. And the court said, then the Northland Office came in and said, we're not going to have to pay these bonds back. The court said that's a harsh and unreasonable result and said, looking at that, you look at the circumstances, bonds are always reissued. That doesn't relieve you of the obligation. We believe that the court did the right thing. The court applied Quinstar to determine if it was ambiguous and that court should be confirmed. Thank you so much, your honors. Very well. Thank you for your argument. Mr. Neistrom. Three very brief points, your honor. First of all, the Quinstar case, I think what counsel is overlooking is that case actually involved two separate contracts that were analyzed. One of which the court found to be unambiguous, the other one which the court found to be ambiguous. And it was to the ambiguous one that they looked to the position of the contracting and the contract as a whole. So there were two different contracts involved. The analysis that I've given you is the correct one and it's supported by Quinstar. Second of all, when you look at proportionality, what's going on here, Mr. Bradley and Midwest are getting a severance payment in exchange for giving up their right, their future right to earn commissions under this contract, which would be much more valuable. The final point that I want to make as to any incentives not to perform, I think is really a red herring. Because again, there was, by being terminated, they no longer have the right to earn fees and commissions under the contract. In addition to that, this contract, there was going to be a restricted period compensation payment made under all circumstances, save two. One of which was if Midwest terminated the contract. And the second one was if the contract was terminated because Midwest violated a law or rule. Those are the only two circumstances under which restricted period compensation wouldn't be paid. So the notion that it somehow incentivized him not to perform just doesn't work here. That's all I have. Thank you, Your Honor. Let me just clarify. What relief are you seeking? There was summary judgment here granted for the other side. What relief are you seeking in your appeal? We are seeking alternative relief. One of which is simply apply the language of the contract and declare that it means what we say it means, which is trailing 12 months sales times seven and a half percent times six, or make the finding as to the clarity and ambiguity and if you have to remand to the district court for that finding to do that. But I think that this court has the authority, given the de novo review, to declare what this contract means. Or this provision, I should say, Your Honor. Okay, thank you for your argument. Thank you to both counsel. The case is submitted. The court will file a decision in due course.